IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIAM M. TODD ) | |
| ) | |
| v. ) | No. 3:10-1073 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:     The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration"), through its Commissioner, denying plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which defendant has responded (Docket Entry No. 21). Plaintiff has further filed a reply brief in support of her motion. (Docket Entry No. 22) Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

## I. Introduction

Plaintiff filed his DIB and SSI applications on October 9, 2007, alleging disability onset as of July 23, 2007. These applications were denied at the initial level of review before the state agency, and then again on reconsideration before that agency. Plaintiff thereafter filed his request for de novo hearing of his claim to benefits by an Administrative Law Judge ("ALJ") of the SSA's Office of Disability Adjudication and Review. A hearing was held before ALJ William Churchill on April 7, 2010. (Tr. 24-60) Plaintiff appeared with counsel and gave testimony, and testimony was also received from an impartial vocational expert. At the conclusion of the hearing the ALJ took the matter under advisement, until May 11, 2010, when the ALJ issued a written decision denying plaintiff's disability claim. (Tr. 9-19) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since July 23, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: anxiety disorder, lumbar spondylosis, degenerative disc disease, status post spinal cord stimulator, chronic pain syndrome (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a narrow range of light work, as defined in 20 CFR 404.1567(b) and 416.967(b), lifting and carrying 20 pounds occasionally and 10 pounds frequently. He can stand/walk 4-6 of 8 hours. He can sit 6 of 8 hours. Pushing and pulling are limited to the

weights given. He can occasionally crawl, squat, stoop or bend. He cannot climb ladders or work at heights. He can concentrate for extended periods of time. He can respond to routine changes in the work environment. He can perform simple, repetitive tasks.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 15, 1979 and was 28 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 23, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 11, 13, 17-18)

On September 8, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The following record review is taken from defendant's brief, Docket Entry No. 19-1 at 2-7:

### A. <u>Medical Evidence</u>

On October 18, 2005, Mr. Todd underwent a psychiatric evaluation by Ahmed I. Farooque, M.D., complaining of depression, anxiety, and some paranoia (Tr. 308-09). Dr. Farooque diagnosed Mr. Todd with panic disorder without agoraphobia, and depressive disorder, not otherwise specified, possible social anxiety disorder (Tr. 309). Dr. Farooque noted that Mr. Todd's current GAF score was 50, and that last year's highest score was 70 (Tr. 309). Dr. Farooque prescribed medication for Mr. Todd, and advised him to return in one month (Tr. 309). Mr. Todd saw Dr. Farooque approximately ten more times over the next few years, until October 2009 (*see* Tr. 303-07, 409, 516-19).

Mr. Todd saw Graf Hilgenhurst, M.D., between June 2006 and January 2010 for treatment relating to, *inter alia*, degenerative disc disease, lumbar spondylosis, herniated nucleus pulposus, and post-laminectomy syndrome (Tr. 235-44, 251-54, 273-74, 279-80, 287-98, 452-507). During the relevant time period, Dr. Hilgenhurst observed at various visits, *inter alia*, tenderness in the lumbar midline, positive straight leg raising, active range of motion, and restricted flexion and extension (*e.g.*, Tr. 239, 241, 251, 452, 454, 461, 463, 465, 494, 497, 503, 506).

Mr. Todd saw William R. Schooley, M.D., between May 2007 and October 2007, for treatment relating to his back (Tr. 314-23). Dr. Schooley diagnosed Mr. Todd with lumbar spondylosis (*e.g.*, Tr. 314, 318). He performed an anterior lumbar interbody fusion, level L5-S1, on Mr. Todd on July 23, 2007, and a translaminar screw fixation on August 6,

2007 (Tr. 260-62, 317, 320, 329-30). Dr. Schooley also prescribed medications for Mr. Todd and advised him to wear a back brace (Tr. 314, 317, 318-19, 320, 321). Dr. Schooley stated that he thought that Mr. Todd's back pain was caused by repetitive bending and lifting 50-pound boxes (Tr. 318, 322). Dr. Schooley imposed a 20-pound weight restriction, and stated that he thought Mr. Todd would damage his back if he tried lifting 50 pounds on a frequent basis (Tr. 316, 321).

A CT of Mr. Todd's lumbar spine on October 16, 2007 revealed postsurgical changes related to the fusion, no hardware complications, and a normal alignment of Mr. Todd's lumbar spine (Tr. 324).

On January 5, 2008, George T. Davis, Ph.D., a State agency consultant, completed a Psychiatric Review Technique form (PRTF), opining that Mr. Todd's mental impairment was not severe (Tr. 373-86). On April 23, 2008, Brad V. Williams, M.D., another State agency consultant, completed another PRTF, also opining that Mr. Todd's mental impairment was not severe (Tr. 415-28).

On January 9, 2008, E. Woods, M.S., M.D., completed a Physical Residual Functional Capacity (RFC) Assessment (Tr. 387-94). He opined that Mr. Todd could perform medium work, and that he had no postural, manipulative, visual, communicative, or environmental limitations (Tr. 388-91). On May 1, 2008, Christopher W. Fletcher, M.D., another State agency consultant, also completed a Physical RFC Assessment, and opined that Mr. Todd could perform light work (Tr. 429-36). He further opined that Mr. Todd could frequently climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl (Tr. 431). He also opined that Mr. Todd had no manipulative, visual, communicative, or environmental limitations (Tr. 432-33).

Mr. Todd saw Dr. Michael J. Baron on February 7, 2008, complaining of pain (Tr. 398). Dr. Baron recorded that Mr. Todd was a 29-year-old who was living a normal life until August 2005, at which time Mr. Todd started to have pain that got worse (Tr. 398). Dr. Baron performed a mental status examination, noted that Mr. Todd's GAF score was 50, and planned to refer him to Dr. McComb or Howell (Tr. 398).

On June 16, 2008, Dr. Hilgenhurst performed a spinal cord stimulator trial (Tr. 464-66). Mr. Todd returned to see Dr. Hilgenhurst on June 23, 2008, to have his trial leads removed, and it was noted that he had done moderately well with the spinal cord stimulator, and he expressed interest in having a permanent lead placement (Tr. 467).

On June 25, 2008, Mr. Todd saw James M. Fish, D.O., M.D., to discuss permanent lead placement (Tr. 439-40). Dr. Fish performed a physical examination, and diagnosed chronic pain syndrome, failed back surgery syndrome, and low back pain (Tr. 439-40). He planned to do a permanent spinal cord implantation (Tr. 440). On August 14, 2008, Dr. Fish implanted a permanent spinal cord stimulator (Tr. 442-44).

On April 3, 2009, Mr. Todd began to complain that he did not think the spinal cord stimulator had been helpful (Tr. 487). On July 27, 2009, he stated that the implant was only helping about 15% (Tr. 493). On August 26, 2009, Dr. Hilgenhurst stated that the stimulator was not working as well as it should, so they were going to reprogram it (Tr. 498).

Mr. Todd returned to see Dr. Fish on January 13, 2010 (Tr. 446-47). Mr. Todd reported that he was doing relatively well, and had some modest improvement in his back pain, but that over the past few months, he had had significant worsening of his back pain (Tr. 446). Mr. Todd also reported that a few weeks previously, he had hit his battery on a door, and that his symptoms had gotten worse since (Tr. 446). Dr. Fish performed a physical

6

examination, and his impressions were spinal cord stimulator implant, orthopedic implant failure; low back pain; chronic pain syndrome; and possible lumbar pseudoarthrosis (Tr. 446). Dr. Fish planned to do a battery replacement and repositioning (Tr. 446).

On February 17, 2010, Dr. Schooley completed a Lumbar Spine RFC Questionnaire (Tr. 509-13). When asked how often Mr. Todd's pain or symptoms would interfere with attention and concentration during a workday, Dr. Schooley checked frequently (Tr. 510). He opined that Mr. Todd could walk one city block without rest or severe pain, stand for 10 minutes at a time, and sit and stand/walk for less than 2 hours total in an eight-hour workday (Tr. 510-11). He also indicated that Mr. Todd needed to walk around for 5 minutes every 15 minutes; needed a job that permitted shifting positions at will; and would need to take frequent unscheduled breaks during the workday (Tr. 511). He checked that Mr. Todd could rarely lift less than 10 pounds, could never twist, stoop, crouch/squat, or climb ladders or stairs, and that his impairments were likely to produce "bad days," and that he was likely to miss more than 4 days of work a month because of his impairments (Tr. 512).

Dr. Fish completed a Lumbar Spine RFC Questionnaire on February 24, 2010 (Tr. 521-25). When asked how often Mr. Todd's pain or symptoms would interfere with attention and concentration during a workday, Dr. Fish checked frequently (Tr. 522). He opined that Mr. Todd could walk one to two city blocks without rest or severe pain, stand for 30 minutes at a time, and sit and stand/walk for less than 2 hours total in an eight-hour workday (Tr. 522-23). He also found that Mr. Todd needed to walk around for 5 minutes every 30 minutes; needed a job that permitted shifting positions at will; and would need to take frequent unscheduled breaks during the workday (Tr. 523). He checked that Mr. Todd

7

could occasionally lift less than 10 pounds, and rarely lift 10 and 20 pounds; could rarely stoop and climb stairs; and could never twist, crouch/squat, or climb ladders (Tr. 524). He further opined that Mr. Todd's impairments were likely to produce "bad days," and that he was likely to miss more than 4 days of work a month because of his impairments (Tr. 524).

B. <u>Non-Medical Evidence</u>

Mr. Todd was 31 years old at the time of the Commissioner's final decision (*see* Tr. 19, 129), with an eleventh grade education (Tr. 28), and past work experience as a roofer helper/construction worker, material handler, and warehouse worker (Tr. 54-55).

Describing his daily activities during the period of his alleged disability, Mr. Todd indicated that he helped to clean the house; took his children to and from school, the baby-sitter, and their activities; cared for a dog; prepared his own meals; drove; shopped for groceries; watched television; coached youth sports; attended his son's sporting events; and went to church (Tr. 165, 171-75, 209-10, 212-13).

C. <u>Vocational Expert Testimony</u>

At the hearing, ALJ Churchill presented the Vocational Expert (VE), Terry L. Vander-Molen, Ph.D., with a hypothetical individual who could sit up to 6 hours a day, but could only walk or stand 4-6 hours; could occasionally lift 20 pounds and frequently lift 10 pounds, and could push or pull those weights respectively; could occasionally crawl, squat, stoop, or bend; could not climb ladders or work at heights; could concentrate for extended periods of time; could respond appropriately to routine changes in the work environment; and could perform simple, repetitive tasks (Tr. 55-56). ALJ Churchill asked if these limitations would preclude Mr. Todd's past relevant work, and the VE stated that they would (Tr. 56). ALJ Churchill then asked if these limitations would allow for other work in the

8

economy, and the VE stated that the individual could perform some light and sedentary unskilled jobs, such as an assembler of small parts/small products, courier, bench assembler, or final assembler (Tr. 56-57).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are

9

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not

10

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C. Plaintiff's Statement of Errors

Plaintiff contends that the ALJ erred in finding that plaintiff has the residual functional capacity ("RFC") to perform light work; in failing to consider all the evidence before him; in rejecting the opinions of plaintiff's treating physicians; in discounting the credibility of plaintiff's subjective pain complaints; in failing to properly evaluate plaintiff's mental impairments; and, in relying upon the testimony of the vocational expert.

The ALJ found that plaintiff had the RFC to perform a range of light work, limited by his capability to stand/walk 4-6 hours per day, his limited capacity for postural maneuvers and climbing ladders or working at heights, and a limitation to performance of simple, repetitive tasks. (Tr. 13) The ALJ based this RFC finding on opinion evidence from the state agency consultants on reconsideration of the initial denial of plaintiff's claim (Tr. 17), and further upon the notes of plaintiff's medical treatment revealing less severe

11

symptoms (when plaintiff was taking his medications) than he alleged at the hearing, as well as the evidence of plaintiff's daily activity level. (Tr. 15-16) In so finding, the ALJ rejected the assessments of plaintiff's treating physicians, Drs. Schooley and Fish, both of whom opined that plaintiff was far more limited in terms of, e.g., standing/walking, sitting, and lifting. (Tr. 16-17, 509-13, 521-25) The ALJ also arrived at his RFC finding having considered plaintiff's subjective pain complaints, which he found less than fully credible.

The medical opinion of a treating source is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially opposed on the record. Even where such an opinion is not entitled to controlling weight, the Sixth Circuit has stated that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, ALJs must provide "good reasons" for discounting the weight of a treating source opinion. See 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); Rogers, 486 F.3d at 242.

The ALJ explained his rejection of the assessments of Drs. Schooley and Fish as follows:

> [T]he undersigned affords both of these opinions little weight because they are inconsistent with the longitudinal, objective evidence of record that shows the claimant consistently reported mild, to at most moderate, levels of pain on a scale of 0 to 10, and consistently showed improvement after his respective surgeries and when compliant with medication. Furthermore, the claimant has described daily activities which are inconsistent with the opinions of both physicians.

(Tr. 17) Previously in his decision, the ALJ had detailed the progression of plaintiff's back

12

impairments and symptoms as reflected in the medical treatment notes which followed his

lumbar fusion and screw fixation surgeries in July and August 2007[2]:

> Thereafter, the claimant was initially noted as stable, was noted as active with his son's pee-wee football team in August of 2007, reported using less pain medication by September of 2007, made enough improvement that he was released to return to work on October 30, 2007, and reported working two jobs, one digging ditches, in November of 2007. These facts do not support a conclusion the claimant had impairments that would have precluded him from working on his alleged onset date, nor do treatment notes indicate his overall health significantly declined.

> Thereafter, the claimant began to again complain of back pain radiating down his legs, but after reporting overuse of pain medication to control his pain in December of 2007 he sought pain management treatment. Initially, treatment notes from January of 2008 indicate that the claimant reported his pain at a level 9 on a scale of 0-10, but also reported that he was out of medication. After obtaining medication, including Oxycodone and Methadone, follow up treatment notes reveal that the claimant only reported pain at a level 4 out of 10 in February of 2008, and although he reported back pain at a level 6 out of 10 in March of 2008 he denied leg pain. Furthermore, treatment notes from April indicate that the claimant's functional impairment was only mild and did not interfere with daily activities such as yard work and coaching his child's baseball team. This evidence shows that the claimant was prescribed and took appropriate medications for his alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications were relatively effective in controlling the claimant's symptoms through April of

---

[2]Included in this review are the notes of plaintiff's treatment with Dr. Hilgenhurst, the treating pain management doctor to whom plaintiff ascribes the June 2008 opinion that his "functional limitation is severe and interferes with most of his daily activities." (Docket Entry No. 12-1 at 13, 14) However, as pointed out in defendant's brief, this statement in Dr. Hilgenhurst's treatment note (Tr. 462) is contained in the "HPI," an acronym for "history of present illness," and thus reflects plaintiff's report of his own functional limitation, rather than Dr. Hilgenhurst's medical opinion. Moreover, that treatment note reflects that plaintiff had run out of his pain medications prior to seeing Dr. Hilgenhurst on that day. (Tr. 462-63) In any event, any opinion of Dr. Hilgenhurst's that would align with those of Drs. Schooley and Fish would effectively have been accounted for by the ALJ, given his rationale for rejecting the latter physicians' opinions.

2008.

Subsequently, the claimant experienced increased pain medication, several different injections and physical therapy after reporting increased pain, none of which provided relief. Accordingly, the claimant had a temporary spinal cord stimulator implantation. However, follow up examination notes reported that the implantation helped the claimant's pain, the midline incision was well-healed, straight leg raising was negative bilaterally, and the claimant only displayed "mildly diminished range of motion in all planes." Additionally, the claimant again reported his pain at only a level 5 out of 10 in July of 2008. Furthermore, although he was diagnosed with failed back surgery syndrome, chronic pain syndrome, and low back pain, which led to the implantation of a permanent spinal cord stimulator in August of 2008, initial follow up examination notes reveal that the claimant was doing relatively well with "modest improvement in his back pain," and even reported his back pain at only a level 3 out of 10. Moreover, the claimant only reported his pain at a level 1 out of 10 in September of 2008, and although he reported pain at a level 10 out of 10 in October, treatment notes reveal that the claimant had been out of medication for two days. Similarly, from January of 2009 through January of 2010, the claimant consistently reported his pain level below a 6 out of 10 when he did not run out of medication, reported his pain at a level 1 or 3 out of 10 on multiple occasions, and was noted as having only mild to moderate functional impairments at every examination but one. These facts do not warrant a finding of disability.

Most recently, it was not until January of 2010 that the claimant again reported worsening back pain, and additionally complained of knee pain. However, examination notes reveal that the claimant was noted with negative, to only mildly positive, straight leg raising bilaterally, no clonus or Babinski bilaterally, 5/5 strength in his hip flexors, quadriceps and hamstrings bilaterally, and grossly intact sensation dermatomes at L1 through S1 bilaterally. Additionally, treatment notes indicate that the claimant's increased back pain was caused by the spinal cord stimulator battery failing prematurely, which physician notes indicate was possible to replace and revise. Furthermore, right and left knee examinations were normal, and an MRI of the claimant's spine only showed mild epidural scarring and mild to moderate degenerative facet changes at L3-4 and L4-5. These facts, combined with the above mentioned mental health treatment notes from October of

> 2009 that indicate that the claimant reported caring for his three young
> children and coached basketball, baseball and football, lead the undersigned to
> find that the claimant can perform a range of work[] requiring lifting and
> carrying of no more than 20 pounds occasionally and 10 pounds frequently, as
> noted in more detail above.

(Tr. 15-16)  In addition to the foregoing review, the ALJ also noted plaintiff's hearing testimony that his methadone pain medication helped for up to six hours at a time, and that he had not laid down for two and one-half hours prior to the hearing, as well as the fact that plaintiff did not ask to lie down or change positions during the 45-minute hearing.  (Tr. 16) Furthermore, the ALJ addressed in some detail the record of plaintiff's limitations resulting from his anxiety disorder, including the assignment of a GAF (Global Assessment of Functioning) scale score of 50.  (Tr. 12)  While plaintiff claims that the assignment of this score on two occasions, once by Dr. Farooque and once by Dr. Baron, amount to opinions by these sources that he has serious psychological symptoms or functional limitations, the law of this circuit rejects the notion that GAF scores alone have any such utility, particularly as against the more particularized assessments of functional limitation that may be contained in the treatment records or medical source statements, as here.[3]  It is clear that the assignment of this score alone does not constitute a treating source opinion which could be entitled to

---

[3] A GAF score is largely superficial, representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person"; it is not raw medical data.  Kennedy v. Astrue, 247 Fed.Appx. 761, 766 (6th Cir. Sept. 7, 2007) (citing Kornecky v. Comm'r of Soc. Sec., 167 Fed.Appx. 496, 511 (6th Cir. Feb. 9, 2006); see also, e.g., Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008).  Consequently, even scores in the 40s, which are generally construed to represent serious psychological problems, have been deemed consistent with an ability to perform at least some jobs in the economy.  See, e.g., Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 877 (6th Cir. 2007).

controlling weight, as argued by plaintiff, nor does the undersigned find error in the ALJ's overall handling of plaintiff's alleged mental limitations vis-à-vis 20 C.F.R. §§ 404.1520a, 404.1545(c), 416.920(a), and 416.945(c).

Plainly, plaintiff's claim to disability is bolstered by the fact that he has suffered spinal impairments severe enough to require surgical procedures, epidural steroid injections, narcotic medications, and the implantation of a spinal cord stimulator. However, the claim is likewise undermined by the fact that he was able to assist in coaching youth sports and participate actively in church services and youth group meetings (Tr. 42-43, 45), as well as by his testimony that methadone has kept him out of pain for six hours at a time, with only "some fatigue every now and then" as a side effect, and his ability to sit through the 45-minute hearing without changing position even though he testified that he would be unable to remain sitting "after 15, 20 minutes, 30 tops[.]" (Tr. 36-37, 48) While plaintiff argues that his role in coaching is limited to 30 minutes at a time, and that he likewise testified to an inability to care for his children or perform household chores anymore, this court "does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 414 (6th Cir. 2011). Rather, "[i]t is the role of the ALJ to resolve conflicts within the evidence." Baldwin v. Astrue, 2009 WL 4571850, at *4 (E.D. Ky. Dec. 1, 2009) (citing Buxton v. Halter, 246 F.3d 762, 775 (6th Cir. 2001)).

Between the medical opinions, treatment records, and testimonial evidence, this record is plainly conflicted. However, and just as plainly, the ALJ's resolution of the conflict after a detailed discussion of the medical treatment of plaintiff's symptoms, and by

16

reference to plaintiff's own report of pain at levels inconsistent with his claim to disability, is sufficiently supported to be sustained under "substantial evidence" review.  The undersigned finds that good reasons were given by the ALJ for rejecting the assessments of Drs. Schooley and Fish; that the ALJ's credibility finding -- due significant deference on judicial review, Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003) -- is substantially supported; and, that the finding of plaintiff's RFC for a narrow range of light work was properly determined[4] and presented to the vocational expert, resulting in sufficient evidence with which the ALJ satisfied the step five burden of showing a significant number of jobs in the economy that plaintiff could be expected to perform despite his impairments.  Accordingly, the undersigned concludes that the SSA's decision to deny benefits should be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

---

[4]The ALJ found the consultant assessments at the initial stage of state agency review to be overly optimistic in view of the record evidence of plaintiff's combination of impairments, and instead adopted the assessments of the consultants at the next stage of state agency review that plaintiff could perform light exertional work, adjusted for limitations on the range of such work that plaintiff could perform upon "giving [him] the extreme benefit of all doubt[.]" (Tr. 17)  While plaintiff argues that this finding is based not on the evidence but on the ALJ's own speculations and lay opinion, the undersigned finds no error here.  In making his RFC finding, the ALJ is not required to wholly accept or reject a given medical assessment, but may rely upon the portions of the assessment that are supported by the totality of the medical and nonmedical evidence.  See Schmidt v. Apfel, 496 F.3d 833, 845 (7th Cir. 2007) (citing Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995)); Cooley v. Comm'r of Soc. Sec., 2009 WL 2982881, at *5-6 (S.D. Ohio Sept. 15, 2009).

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this18th day of March, 2013.

           s/ John S. Bryant
           JOHN S. BRYANT
           UNITED STATES MAGISTRATE JUDGE